James E. Magleby (7247)
  magleby@mcgiplaw.com
Christine T. Greenwood (8187)
  greenwood@mcgiplaw.com
MAGLEBY CATAXINOS & GREENWOOD
170 South Main Street, Suite 1100
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Plaintiff SnapPower

---

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SNAPRAYS, LLC, dba SNAPPOWER,**<br><br>     **Plaintiff,**<br>**v.**<br><br>**ONTEL PRODUCTS CORPORATION, TELEBRANDS CORPORATION, ASHOK "CHUCK" KHUBANI, and AJIT "AJ" KHUBANI,**<br><br>     **Defendants.** | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><br><br><br><br>**Case No.: 2:16-cv-01198**<br><br>**Honorable: Brooke C. Wells** |

Plaintiff SnapRays, LLC, dba SnapPower, by and through its counsel MAGLEBY CATAXINOS & GREENWOOD, alleges and complains against Defendants Ontel Products Corporation, Telebrands Corporation, Ashok "Chuck" Khubani, and Ajit "AJ" Khubani (collectively, "Defendants") as follows:

**PARTIES**

1.      Plaintiff SnapRays, LLC, is a Utah limited liability company doing business as SnapPower ("Plaintiff" or "SnapPower"), with its principal place of business in Utah County, Utah.

2.      Defendant Ontel Products Corporation ("Ontel") is a New Jersey corporation with its principal place of business in Essex County, New Jersey.

3.      Upon information and belief, Defendant Ashok Khubani, who goes by the name of Chuck Khubani ("Chuck Khubani"), is the CEO of Ontel and a resident of Essex County, New Jersey.

4.      Defendant Telebrands Corporation ("Telebrands") is a New Jersey Corporation with its principal place of business in Essex County, New Jersey.

5.      Upon information and belief, Defendant Ajit Khubani, who goes by the name of AJ Khubani ("AJ Khubani"), is the CEO of Telebrands and a resident of Essex County, New Jersey.

6.      Chuck Khubani and AJ Khubani are brothers.

**JURISDICTION AND VENUE**

7.      This is a civil action for unfair competition under the Lanham Act, the Patent Act, and a number of Utah statutes.  Jurisdiction in this Court is founded upon 28 U.S.C. §§ 1331, 1332, and 1338.

8.      With respect to 28 U.S.C. § 1332, diversity jurisdiction is present because, while SnapPower is a citizen of Utah, and Ontel and Telebrands are both New Jersey

corporations headquartered in New Jersey.  Similarly, Chuck Khubani and AJ Khubani are residents of New Jersey.  The amount in controversy is in excess of $75,000.

9.     This Court has personal jurisdiction over Defendants because they have conducted continuous and systematic business in the state of Utah, have numerous contacts with the state of Utah, and have committed and continue to commit acts of false advertising, infringement, unfair competition, and related tortious acts in this district, as alleged herein.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1400(b) and 1391(b) and (c).

## FACTUAL ALLEGATIONS

### Background

11.     SnapPower is the designer, manufacturer, marketer, and seller of two original and high quality products at issue in this case – the Guidelight, an electric outlet cover with built-in LED lighting and a light sensor; and the SnapPower Charger, an electric outlet cover with a built-in USB charger.  These products essentially transform electric outlets into night lights or chargers in a safe, sleek, easy-to-install manner, while leaving the electrical outlets free for use with other devices.

12.     SnapPower is the current assignee, and the sole and exclusive owner of all right, title and interest in United States Patent No. 8,912,442  ("the '442 patent), entitled "Active Cover Plate."  The '442 patent was duly and legally issued by the PTO on December 16, 2014.  The named inventor of the '442 patent is Jeremy Smith.  A copy of the '442 patent is attached hereto as Exhibit A.

3

13.    SnapPower is the current assignee, and the sole and exclusive owner of all right, title and interest in United States Patent No. 9,035,180 ("the '180 patent) (collectively, with the '442 patent, the "patents-in-suit"), entitled "Active Cover Plates." The '180 patent was duly and legally issued by the PTO on May 19, 2015. The named inventors of the '180 patent are Jeremy Smith, Phil Dietz, Sean Watkins, Jan Finlinson, Martin Johnson, and Jeremy Willden.  A copy of the '180 patent is attached hereto as Exhibit B.

14.    The inventions of the patents-in-suit are directed at active electrical outlet covers with electrical loads that perform functions, such as LED lighting, light sensor, USB charger, speakers, and thermostats.  The patented inventions accomplish all of these functions while not impeding access to the electric outlets themselves.

15.    SnapPower also has designed and developed a product known as the SwitchLight, which is a light switch cover with LED lighting similar to the Guidelight. Although SnapPower has not yet offered the SwitchLight product for sale on its website, www.snappower.com, it has shown the product at trade shows, has patent applications pending as to certain aspects of the product, and has sold a large number of units to a hospitality customer.

16.    Ontel and Telebrands, each of which is a big player in what is known as the "direct-response" or "infomercial" industry and affiliated with and/or the originators of the "As Seen On TV" brand, recently created and broadcasted nationwide one minute, thirty-second-plus television commercials that unabashedly feature and offer for sale the original SnapPower Guidelight, using actual Guidelights they purchased from

SnapPower in the video footage.  The commercials are also displayed on the specific websites created to sell the products.

17.     Ontel has dubbed its knock-off product the "Night Angel," and Telebrands has opted for the name "Luma Plate."  Despite these changes to the names of the product, however, there can be no doubt that the product actually being offered for sale in the commercials and on their websites is the original Guidelight.  Indeed, Defendants and/or their associates purchased Guidelights and SnapPower USB Chargers from SnapPower just months, if not weeks, before the websites went live and the commercials were broadcast on television.

18.     Neither Defendant has the right to resell SnapPower's products.  Instead, Defendants have purchased limited numbers of SnapPower's products for use in their marketing and presumably to create knock-off products.  In other words, Defendants are offering to sell products that are not their own, and they do not even have the advertised product to sell.

19.     Also troubling is that the Ontel-created website, www.buynightangel.com, features images and photographs lifted directly from the SnapPower website.  Needless to say, SnapPower has not authorized the use of its website, images, or video marketing to any third party, nor has SnapPower licensed or otherwise permitted Ontel or Telebrands to sell its products.

20.     In addition to misappropriating and infringing SnapPower's intellectual property rights, Defendants are falsely advertising that they have unique products to sell and deliver, when in fact it appears they have not made or sold anything.  Despite

providing toll-free numbers and online ordering options to consumers, orders are not fulfilled or processed and, upon information and belief, no product has been shipped.

21.     Defendants – with the substantial assistance, guidance, and approval of their CEOs – are knowingly and willfully engaging in a practice known as "testing the market," in which they rapidly create television commercials and websites to determine whether sufficient sales can be generated to justify manufacturing and marketing a knock-off product.

22.     Telebrands' CEO AJ Khubani admitted in an article published by the New York Post in 2007 that this is standard practice for Telebrands.

23.     SnapPower has suffered and will continue to suffer irreparable harm and lost profits due to Defendants' conduct, including damage to its goodwill and reputation, warranting immediate preliminary injunctive relief.

**Ontel and Telebrands' False Advertising, Theft, and Infringement**

24.     Ontel is a marketer and distributor of numerous consumer products, including Miracle Copper Socks, Slushy Magic, the Foot Angel, and the Slap Chop. Ontel markets its products through television commercials and a multitude of separate websites named after the individual products.  Ontel sells its products via telephone, online orders, and at various retail stores, including "big box" stores like Walmart.

25.     Ontel recently began aggressively marketing the Guidelight under the name Night Angel – using images and video footage of SnapPower's Guidelight – through a one minute thirty-second-plus commercial broadcast on national television

and through a newly-launched website, www.buynightangel.com, where the commercial is also displayed.

26.     Through the same website, Ontel is also offering for sale a product similar to the SnapPower USB Charger, which purports to have three USB ports for charging electric devices such as cell phones, tablets, and other similar products.

27.     Ontel is also offering to sell a light switch cover that purports to have LED lighting.

28.     Upon information and belief, Ontel is actively directing traffic to www.buynightangel.com and marketing its infringing Night Angel product by purchasing Google adwords.

29.     Upon information and belief, Chuck Khubani is a moving and active force behind Ontel's purported Night Angel products, having reviewed, approved, and materially assisted in the advertising and associated misconduct.

30.     Like Ontel, Telebrands is a marketer and distributor of numerous consumer products, including AmberVision sunglasses, Pocket Hose, Couch Coat, and the Ped Egg foot file.  Also like Ontel, Telebrands markets its products through television commercials and a multitude of separate websites named after the individual products.  Telebrands sells its products via telephone, online, and at various retail stores.

31.     Telebrands also recently began aggressively marketing a product identical to the Guidelight, the Luma Plate, through one minute, thirty-second-plus commercial

broadcast on national television and through a newly-launched website, www.lumaplate.com, where the commercial is also displayed.

32.    Upon information and belief, Telebrands is also actively directing traffic to www.lumaplate.com and marketing its infringing Luma Plate product by Google adwords.

33.    Upon information and belief, AJ Khubani is a moving and active force behind Telebrands' purported Luma Plate, having reviewed, approved, and materially assisted in the advertising and associated misconduct.

34.    The Ontel and Telebrands commercials not only falsely advertise the Guidelight for sale, but they are substantially similar to and incorporate many features of the Guidelight marketing video prepared by SnapPower and displayed on its website.

35.    In addition, many of the images and photos on the www.buynightangel.com and www.lumaplate.com websites are similar or identical to those on SnapPower's website, or are "photoshopped" or altered versions of SnapPower's photographs and images.  The www.buynightangel.com and www.lumaplate.com websites also utilize portions of the layout, design features, and text from the SnapPower website, including certain text that is copied verbatim and design features that are exactly the same as those on SnapPower's website.

36.    Parts of the commercials put out by Ontel and Telebrands also strongly resemble portions the SnapPower video highlighting the Guidelight.

37.    Stated otherwise, Defendants have also copied and created knock-off versions of SnapPower's websites and video marketing.

38.     Prior to creating their own alleged products and websites, and beginning roughly in September 2016, Defendants and/or persons affiliated with them purchased numerous Guidelights and SnapPower USB Chargers from SnapPower, presumably for purposes of examining and copying the product, as well as using it in their internet and commercial advertising.

39.     For example, on August 29, September 2, 8 and 20, October 2, October 11, 12, October 24, October 28, and November 4, 2016, Ontel's CEO, Chuck Khubani, placed various orders for SnapPower products, including Guidelights and SnapPower USB Chargers.  These orders were all shipped to an Ontel employee, Lisa Siervo, at Ontel's business address.

40.     On September 6, 2016, an individual named Daniel Bora ordered a Guidelight, which was also shipped to Ms. Siervo at Ontel's business address.

41.     On October 2, 2016, an individual named Neil Khubani purchased five Guidelights.  Upon information and belief, Neil Khubani is related to Ontel, Telebrands, and/or its principals, Chuck and AJ Khubani.

**Discovery of the Ontel and Telebrands Commercials
and Resulting Customer Confusion**

42.     In early November 2016, SnapPower discovered that Ontel was running a commercial for the Night Angel, when an acquaintance and SnapPower customer alerted one of SnapPower's founders that he had seen a commercial for an "Angel light" on ESPN.  At the same time or shortly thereafter, SnapPower discovered the www.buynightangel.com website.

43.     On the same day, a relative of another SnapPower employee saw the Night Angel commercial on television twice.  He was confused as to whether the Night Angel was the SnapPower Guidelight or whether SnapPower had partnered with someone else to sell the Guidelight.

44.     On November 8, 2016, another SnapPower customer contacted SnapPower regarding the Luma Plate, stating that he had seen a television commercial for the Luma Plate and inquiring if the www.lumaplate.com website belonged to SnapPower.

45.     The customers who contacted SnapPower about the Night Angel and the Luma Plate were confused by the advertising for those alleged products, believing the products to be the Guidelight.

46.     Since that time, a potential customer expressed confusion as to the source of SnapPower's products on SnapPower's Facebook page.  The customer had attempted to purchase an outlet cover with LED lighting, but posted a complaint on the page when his purchase was unsuccessful, reporting that he was disappointed with the experience.

47.     Another customer recently posted a snapshot from the Night Angel website on the SnapPower Facebook page, inquiring whether the product depicted was a SnapPower product.

48.     On November 23, 2016, another individual sent an email to the SnapPower customer service department, asking why her order had not yet arrived.

She attached a copy of the order to her email.  The order clearly indicates that what she purchased was a Night Angel and a Night Angel USB charger.

49.     Confusion among consumers is highly likely to continue and increase. Moreover, due to the poor customer service and inability to complete purchases on the Ontel and Telebrands websites, SnapPower's reputation and goodwill, built up over years and through careful planning, will be tarnished and irreparably harmed, if Defendants are allowed to continue their knock-off strategy.

### Ontel and Telebrands' History and Pattern of Improper Business Practices

50.     Both Ontel and Telebrands are well known marketers of "As Seen On TV" products.

51.     Telebrands touts itself as the creator of the "As Seen On TV" brand and logo.

52.     Telebrands is one of the biggest spenders in the market, having reportedly spent around $2.6 billion on advertising in 2008.

53.     Because of their superior size, market penetration, and retail connections, Defendants are able to quickly generate advertising and commercials to aggressively market knock-off products.  If justified by their "test marketing," they are able to quickly manufacture knock-off products and get them into "big-box" stores.

54.     In a 2007 article, AJ Khubani described walking around shopping malls looking at the products offered by kiosks to get ideas for his company.  During the interview, he bought a product from a kiosk – a waterproof keyboard cover – to look into

11

for his own company, saying to the interviewer, "See?  We just found a product.  It's not

that hard."

55.     According to AJ Khubani, Telebrands will launch a large number of

commercials for different products at a time to determine if the products will sell.

Telebrands will not manufacture the products if the test marketing does not indicate a

sufficiently large sales opportunity.  As described in the article,

> To roll out five new items, as Khubani will do this year, he'll
> film infomercials for at least twenty and try each one for a
> week.  Each trial needs to generate double its advertising
> costs to make it to a full launch, which involves buying millions
> of dollars in national advertising time and ordering between a
> half-million and a million pieces.

56.     In a more recent article, the process was similarly described:

> [T]he best [products] are chosen and given test marketing; the
> company will film 20 infomercials and try them out for at least
> a week.  If the product generates double the advertising cost,
> it moves to a wider release.  A month or two later, the[]
> [products] will end up on the "As Seen On TV" section of many
> chain stores.

57.     In 2009, AJ Khubani stated that, "If something is in the marketplace

already and I can do a better job, I will."

58.     Upon information and belief, Defendants specifically target potential

competitors in an effort to eliminate them from the marketplace, thereby decreasing

competition.


### SnapPower's Products and Marketing – the Details


12

59.    SnapPower is the developer, manufacturer, and distributor of the Guidelight, which it first began selling and shipping in May 2014.  SnapPower is a Utah company with approximately twenty employees.

60.    SnapPower successfully raised substantial startup funds through a Kickstarter campaign in 2014, and its products have been favorably reviewed, awarded prizes, displayed in numerous publications, and featured on various television programs, including the Today Show.

61.    The Guidelight is an outlet cover that provides LED lighting through three separate LED bulbs located on the bottom of the cover.  The Guidelight is used in place of a traditional outlet cover and functions as a "night light," providing light for comfort and safety:



62.     The LED lights are turned on and off automatically by a sensor located in

the lower left quadrant of the Guidelight, as shown in the image immediately above.

63.     The Guidelight is easy to install and requires no wiring or batteries.

64.     SnapPower offers for sale two versions of the Guidelight, the "Duplex" and

the "Decor."



Both the Duplex and the Decor versions of the Guidelight are offered in four different

colors – white, light almond, ivory, and black.

65.    In addition to the Guidelight, SnapPower offers for sale the SnapPower Charger, which is an electric outlet cover with a built-in USB port that can be used to charge phones, tablets, and similar devices, and which comes in white, light almond, and ivory:



66.    SnapPower currently has one additional product, the Switchlight, that it has not yet offered for sale through its website. The Switchlight is a light switch cover that provides LED lighting similar to the Guidelight.  SnapPower has shown the product at trade shows and has patent applications pending as to certain aspects of the product. SnapPower has manufactured hundreds of units of this product, received certification for the product from a Nationally Recognized Testing Laboratory (ETL), and sold a large order to a hospitality customer.

67.    SnapPower developed its unique website, www.snappower.com, for purposes of marketing and selling its devices.  SnapPower's website has copyright

notices displayed on the bottom of each page.  The website has yet not been registered for copyright protection.

68.     SnapPower's website has a number of photographs, images, text, and that were prepared specifically for and belong to SnapPower.

69.     As just one an example, the homepage features a photograph of a lighted Guideline at the bottom of a staircase in an otherwise dimly lit area.  The photograph was taken in the home of SnapPower's CEO, Jesse Leishman:



70.     SnapPower's website also includes a number of videos, one of which is a marketing video for the Guidelight.

71.     SnapPower has spent considerable resources and time developing its products and its marketing materials, including the www.snappower.com website, the videos, and print marketing.

**Ontel's Knock-Off Products and Marketing**

72.     Ontel is the owner and registrant of the domain name buynightangel.com, which was created on August 5, 2016.

73.     Ontel markets, offers for sale, and purportedly sells the Night Angel product, an outlet cover with a USB charger, an outlet cover with LED lighting, and a light switch cover with LED lighting.

74.     Upon information and belief, none of the products being offered for sale through the www.buynightangel.com website is actually available for purchase.

75.     In fact, representatives of SnapPower and other third parties have attempted to purchase each of the products offered for sale on Ontel's Night Angel website, but none of the credit cards entered for the purchases have been processed and no product has shipped.

76.     The Night Angel is or appears to be identical to the Guidelight, such that Ontel is literally advertising (and possibly manufacturing a duplicate of) the Guidelight for sale, i.e., *the same actual product* as SnapPower's Guidelight, although in some instances Ontel has doctored the photographs so that the light sensor appears on the lower right corner of the outlet cover, rather than on the lower left corner, or so that the sensor does not appear at all.

77.     Upon information and belief, the photos of the purported Night Angel product are photos of the *actual* Guidelight.  The following are depictions of the purported Night Angel captured from the online video appearing on the Night Angel website.  In these images, Ontel did not bother to change the side on which the light sensor is located:







78.    In another example of Ontel's blatant copying, the Night Angel lights, as with the Guidelights, are offered in "Duplex" and "Decor" styles:



79.    Ontel has also directly lifted images from the SnapPower website and published them on the Night Angel website.  For instance, the photo taken inside the SnapPower CEO's home has been doctored and reprinted as follows:

| Night Angel Website | SnapPower Website |
| --- | --- |
| | |



80.     The Night Angel website also incorporates an image from the SnapPower

website, *with the exact same text* surrounding it:

| Night Angel Website | SnapPower Website |
|---|---|
|  | |

81.     Another portion of the Night Angel website likewise incorporates text and

layout features nearly identical to a portion of the SnapPower website, including the

exact same text and numbers in grey circles.  The SnapPower website image is as

follows:



82.    The similar portion of the Night Angel website is as follows:



83.    Ontel also purports to sell an outlet plate with USB charger ports, similar but not identical to the SnapPower USB charger.



84.    However, the design offered by Ontel would be impossible to engineer and would not function as depicted.

85.    Accordingly, the images of the "Night Angel With USB Ports" are "photoshopped" or doctored images of SnapPower's product, and purport to offer a product for sale that literally does not exist.

86.    In addition to offering the Night Angel and the Night Angel with USB ports, the Night Angel purports to offer a Night Angel "Switch Light," like the newly-released SnapPower SwitchLight.  SnapPower has displayed its light switch product at trade shows and has begun selling it.  The Night Angel Switch Light is depicted as follows:



**Telebrands' Knock-Off Product and Advertising**

87.     Upon information and belief, Telebrands is the owner of a website called

www.lumaplate.com, on which it ostensibly offers for sale a product identical to

SnapPower's Guidelight, the Luma Plate.  Like the Guidelight, the Luma Plate – which

again appears to actually *be* the Guidelight – has a light sensor in the lower left corner,

with three LED bulbs emitting light from the bottom of the cover plate:



88.     Like the Guidelight, the Luma Plate comes in both standard and "decor" options:



89.     Not only is the Luma Plate product itself identical to the Guidelight, but also the Luma Plate Website features many of the same design features and text as are displayed on SnapPower's website.

90.     The Luma Plate website also displays a video commercial displaying the Luma Plate and how it operates, which itself has numerous similarities to the Guidelight information video that appears on the SnapPower website.  Indeed, all or most of the images of the purported Luma Plate that appear in the commercial are photos of the actual Guidelight, which Telebrands has not even bothered to "photoshop" or modify in

any way.  Telebrands is therefore falsely but unmistakably representing the Guidelight as its own product.

**Litigation and Regulatory Action against Ontel and Telebrands**

91.     Ontel and Telebrands are no strangers to litigation and regulatory action, with multiple lawsuits having been filed against them around the country, starting as far back as the 1990s.

92.     For example, the State of New Jersey recently sued Telebrands for violations of the Jew Jersey Consumer Fraud Act and Advertising Regulations, including aggressively upselling its products, subjecting consumers to lengthy ordering processes, failing to provide a means for consumers to decline offers for additional products, shipping and billing for additional products not ordered by consumers, and failing to provide customers the opportunity to speak with live customer service agents.

93.     Telebrands agreed to pay $550,000 and cease its improper sales practices to settle the matter.

94.     Telebrands and its owner, AJ Khubani, have also been the subjects of action by the Federal Trade Commission ("FTC"), including an action related to a product known as the Ab Force.  That matter was settled when Telebrands agreed to pay $7 million, as part of settlement and customer restitution agreement.

95.     Ontel and Telebrands have been subject to numerous lawsuits involving the knock-off business strategy, with fact patterns similar to those presented here, involving the poaching of products and intellectual property from their original creators without authority, attribution, or compensation.

26

96.     It appears that Ontel and Telebrands view regulatory actions and litigation as a routine cost of doing business, which they simply offset by large profit margins.

97.     Indeed, Ontel and Telebrands appear to be able to capitalize on the delays associated with litigation because, by the time a given case provides the injured manufacturer relief, Ontel and Telebrands have already profited handsomely from the knock-off strategy and their aggressive product sales and marketing, even accounting for the cost of litigation.

<u>**FIRST CLAIM FOR RELIEF**</u>
**(LANHAM ACT FALSE ADVERTISING)**

98.     Plaintiff incorporates the preceding paragraphs by reference.

99.     Ontel and Telebrands each have made materially false and misleading misrepresentations of fact in connection with the commercial advertising for their purported Night Angel and Luma Light products, including that the products are available for sale, that the products are their own, and that the photographs of the products on their websites and in their video and television marketing materials are their own photographs of their own products.

100.    Ontel and Telebrands' marketing and advertising are literally false because they are offering SnapPower's products for sale, without being in possession of such products, and without yet having manufactured any competing product.

101.    Ontel and Telebrands' marketing and advertising likewise convey a materially false impression that is highly likely to confuse consumers.

102.    Ontel and Telebrands have made these misrepresentations in interstate commerce, including in television commercials and on the www.buynightangel.com and www.lumalight.com websites.

103.    The misrepresentations of Ontel and Telebrands have caused and are likely to continue to cause both confusion as to the source and origin of the products and as to the characteristics of the products.

104.    Plaintiff is suffering and is likely to continue to suffer both lost and diverted sales and harm to its goodwill, in which it has invested substantially and which it has worked over time to develop.

105.    Plaintiff has suffered and will continue to suffer irreparable injury and damages as a result of Defendants' conduct.

106.    Plaintiff is entitled to recover its damages, Defendants' profits, and the costs of suit.  Because of the willful nature of Defendants' conduct and exceptional nature of this action, Plaintiff is also entitled to enhanced damages and attorney's fees.

## SECOND CLAIM FOR RELIEF
### (UTAH UNFAIR PRACTICES)

107.    Plaintiff incorporates the preceding paragraphs by reference.

108.    By, among other things, blatantly copying and advertising for sale SnapPower's products, which Ontel and Telebrands are not authorized or prepared to sell, Ontel and Telebrands have engaged in unfair methods of competition in commerce or trade.

109.    Ontel and Telebrands' conduct amounts to unfair and discriminatory conduct that destroys and prevents honest competition.

110.   Ontel and Telebrands each have violated Section 13-5-8 of the Utah Unfair Practices Act by advertising for sale goods and merchandise that they are not prepared to supply.

111.   Due to his direct and indirect assistance to Ontel in violating the Utah Unfair Practices Act, Chuck Khubani is liable as a director, officer, and/or agent of Ontel under Utah Code Ann. § 13-5-6.

112.   Due to his direct and indirect assistance to Telebrands in violating the Utah Unfair Practices Act, Ajit Khubani is liable as a director, officer, and/or agent of Telebrands under Utah Code Ann. § 13-5-6.

113.   As a result of Defendants' conduct, Plaintiff is entitled under Utah Code Ann. § 13-5-14 to immediate injunctive relief and damages, including but not limited to three times the amount of its actual damages, and court costs.

114.    Plaintiff is entitled to attorney's fees and pre-and post-judgment interest as provided by law.

## THIRD CLAIM FOR RELIEF
### (UTAH UNFAIR COMPETITION)

115.   Plaintiff incorporates the preceding paragraphs by reference.

116.   Defendants are competitors of SnapPower and have engaged in unfair competition under Section 13-5a-102(4) of the Utah Unfair Competition Act.

117.   Defendants have intentionally engaged in unfair competition by intentionally committing business and acts and practices in commerce that are unlawful, unfair, and fraudulent, including without limitation by falsely representing SnapPower's products as their own, falsely representing they have product to sell, when in fact they

do not, and by misappropriating, infringing, and otherwise interfering with SnapPower's intellectual property rights.

118.    Defendants' acts and practices have led to a material diminution in value of Plaintiffs' intellectual property, including their copyrights and patents.

119.    Defendants' acts and practices are infringements of Plaintiff's patents and intellectual property rights.

120.    As a result of Defendants' conduct, Plaintiff is entitled to actual damages, costs, attorney's fees, and pre- and post-judgment interest, as provided by law.

121.    Due to the intentional, deliberate, and malicious nature of Defendants' conduct, Plaintiff is entitled to punitive damages under Section 13-5a-103(1)(a)(iii) of the Utah Unfair Competition Act.

### FOURTH CAUSE OF ACTION
### (PATENT INFRINGEMENT OF U.S. PATENT NO. 8,912,442 BY ONTEL)

122.    Plaintiff incorporates the preceding paragraphs by reference.

123.    Defendant Ontel has been, is currently, and will continue to directly infringe one or more claims of the '442 patent by making, using, offering to sell, and selling within the United States the Night Angel product.

124.    Upon information and belief, such acts of infringement by Ontel have been, and continue to be, willful and deliberate, and SnapPower reasonably believes that such acts of infringement will continue in the future unless enjoined by this Court.

125.    As a direct and proximate consequence of Ontel's infringement of the '442 patent, Plaintiff has suffered and will continue to suffer irreparable injury and damages, in an amount not yet determined, for which Plaintiff is entitled to relief.  Plaintiff seeks

damages, as well as preliminary and permanent injunctive relief against further infringement.

## FIFTH CAUSE OF ACTION
### (PATENT INFRINGEMENT OF U.S. PATENT NO. 8,912,442 BY TELEBRANDS)

126.    Plaintiff incorporates the preceding paragraphs by reference.

127.    Defendant Telebrands has been, is currently, and will continue to directly infringe one or more claims of the '442 patent by making, using, offering to sell, and selling within the United States the Luma Light product.

128.    Upon information and belief, such acts of infringement by Telebrands have been, and continue to be, willful and deliberate, and SnapPower reasonably believes that such acts of infringement will continue in the future unless enjoined by this Court.

129.    As a direct and proximate consequence of Telebrands' infringement of the '442 patent, Plaintiff has suffered and will continue to suffer irreparable injury and damages, in an amount not yet determined, for which Plaintiff is entitled to relief. Plaintiff seeks damages, as well as preliminary and permanent injunctive relief against further infringement.

## SIXTH CAUSE OF ACTION
### (PATENT INFRINGEMENT OF U.S. PATENT NO. 9,035,180 BY ONTEL)

130.    Plaintiff incorporates the preceding paragraphs by reference.

131.    Defendant Ontel has been, is currently, and will continue to directly infringe one or more claims of the '180 patent by making, using, offering to sell, and selling within the United States the Night Angel product.

132.   Upon information and belief, such acts of infringement by Ontel have been, and continue to be, willful and deliberate, and SnapPower reasonably believes that such acts of infringement will continue in the future unless enjoined by this Court.

133.   As a direct and proximate consequence of Ontel's infringement of the '180 patent, Plaintiff has suffered and will continue to suffer irreparable injury and damages, in an amount not yet determined, for which Plaintiff is entitled to relief.  Plaintiff seeks damages, as well as preliminary and permanent injunctive relief against further infringement.

### SEVENTH CAUSE OF ACTION
### (PATENT INFRINGEMENT OF U.S. PATENT NO. 9,035,180 BY TELEBRANDS)

134.   Plaintiff incorporates the preceding paragraphs by reference.

135.   Defendant Telebrands has been, is currently, and will continue to directly infringe one or more claims of the '180 patent by making, using, offering to sell, and selling within the United States the Luma Light product.

136.   Upon information and belief, such acts of infringement by Telebrands have been, and continue to be, willful and deliberate, and SnapPower reasonably believes that such acts of infringement will continue in the future unless enjoined by this Court.

137.   As a direct and proximate consequence of Telebrands' infringement of the '180 patent, Plaintiff has suffered and will continue to suffer irreparable injury and damages, in an amount not yet determined, for which Plaintiff is entitled to relief. Plaintiff seeks damages, as well as preliminary and permanent injunctive relief against further infringement.

## EIGHT CAUSE OF ACTION
### (INJUNCTION – ALL DEFENDANTS)

138.   Plaintiff incorporates the preceding paragraphs by reference.

139.   Defendants have violated Plaintiff's rights and have otherwise acted in an unlawful manner, as set forth in the preceding causes of action.  Plaintiff has a substantial likelihood of prevailing on the merits of these claims.

140.   Unless an injunction issues, Plaintiff will suffer irreparable harm, including but not limited to permanent injury to its goodwill, ability to do business, and/or loss of business in an amount difficult or impossible to quantify.

141.   An injunction would not be adverse to the public interest.

142.   The threatened injury to Plaintiff outweighs whatever damage an injunction could cause to Defendants.

143.   There is a substantial likelihood that Plaintiff will prevail on the merits of the claims for which injunctive relief is sought, or there are serious issues on the merits which should be the subject of further litigation.

144.   Therefore, under Rule 65 of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(a),Plaintiff is entitled to a temporary restraining order and preliminary injunction that includes, at a minimum, the following relief:

(a)   That Defendants be ordered immediately to discontinue making any and all false and misleading statements in connection with their advertising and marketing;

(b)   That Defendants be ordered to cease offering for sale any product they do not have, including any and all products offered or sold by SnapPower;

(c)     That Defendants immediately cease and desist from marketing and advertising for sale the Night Angel and Luma Plate, including without limitation via television, through the internet, or in print;

(d)     That the www.buynightangel.com and www.lumaplate.com websites be immediately taken down and discontinued;

(e)     That Defendants are disgorged of and precluded from utilizing the fraudulently obtained consumer information and market research;

(f)     That Defendants be enjoined from continuing to infringe the '442 and '180 patents; and

(g)     Any additional relief warranted at law or necessary to protect Plaintiff's rights, to be determined by the facts and circumstances at the time of entry of the order.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court enter judgment against Defendants as follows:

1.     For a temporary restraining order and preliminary and permanent injunction enjoining Defendants, their officers, agents, servants, employees and attorneys, successors and assigns, and all other persons acting in concert or participation with Defendants;

2.     Entry of a judgment declaring that Ontel has infringed one or more claims of the '442 patent;

3.     A preliminary and permanent injunction against the continuing infringement of the '442 patent by Ontel;

4.     Entry of a judgment declaring that Telebrands has infringed one or more claims of the '442 patent;

5.     A preliminary and permanent injunction against the continuing infringement of the '442 patent by Telebrands;

6.     Entry of a judgment declaring that Ontel has infringed one or more claims of the '180 patent;

7.     A preliminary and permanent injunction against the continuing infringement of the '180 patent by Ontel;

8.     Entry of a judgment declaring that Telebrands has infringed one or more claims of the '180 patent;

9.     A preliminary and permanent injunction against the continuing infringement of the '180 patent by Telebrands;

10.     For damages sufficient to compensate Plaintiff for Defendants' wrongful conduct and infringement, including for Plaintiff's lost profits, lost sales, Defendants' sales, and/or for lost license fees and royalties;

11.     For an award to Plaintiff of its damages to compensate for Defendants' infringement, pursuant to 35 U.S.C. § 284, said damages to be trebled because of Defendants' willful infringement;

12.     An award of pre-judgment and post-judgment interest and costs;

13.     An award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117, 35 U.S.C. § 285, and Utah law; and

14.     For such other further relief to which Plaintiff may be entitled in law and in equity.

## DEMAND FOR JURY TRIAL

SnapPower demands a trial by jury on all matters herein so triable in accordance with Federal Rule of Civil Procedure 38(b).

DATED this 28th day of November, 2016.

MAGLEBY CATAXINOS & GREENWOOD

/s/ Christine T. Greenwood
James E. Magleby
Christine T. Greenwood
*Attorneys for Plaintiff SnapRays, LLC dba SnapPower.*

36