James E. Magleby (7247)
 magleby@mcgiplaw.com
Christine T. Greenwood (8187)
 greenwood@mcgiplaw.com
MAGLEBY CATAXINOS & GREENWOOD
170 South Main Street, Suite 1100
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Plaintiff SnapPower

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SNAPRAYS, LLC, dba SNAPPOWER,** | **MOTION FOR TEMPORARY RESTRAINING ORDER** |
| **Plaintiff,** | |
| **v.** | |
| **ONTEL PRODUCTS CORPORATION, TELEBRANDS CORPORATION, DIGITAL TARGET MARKETING, LLC, ASHOK "CHUCK" KHUBANI, and AJIT "AJ" KHUBANI,** | |
| | **Case No.:  2:16-cv-01198** |
| **Defendants.** | **Honorable Brooke C. Wells** |

Plaintiff SnapRays, LLC, d/b/a SnapPower ("Plaintiff" or "SnapPower"), by and

through its counsel MAGLEBY CATAXINOS & GREENWOOD, submits this Motion for

Temporary Restraining Order.

## TABLE OF CONTENTS

Page

STATEMENT OF FACTS .................................................................. 10

ARGUMENT .................................................................................. 34

I.    SNAPPOWER IS ENTITLED TO AN *EX PARTE* TEMPORARY
      RESTRAINING ORDER AGAINST DEFENDANTS ........................... 34

II.   SNAPPOWER IS ENTITLED TO A TEMPORARY RESTRAINING
      ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS'
      CONDUCT .................................................................................. 35

      A.    SNAPPOWER IS SUFFERING AND WILL CONTINUE TO
            SUFFER IRREPARABLE HARM ABSENT THE REQUESTED
            INJUNCTIVE RELIEF .......................................................... 36

      B.    THE HARM FACING SNAPPOWER FAR OUTWEIGHS ANY
            POTENTIAL HARM TO DEFENDANTS FROM THE REQUESTED
            INJUNCTIVE RELIEF .......................................................... 40

      C.    ISSUANCE OF THE REQUESTED INJUNCTIVE RELIEF WILL
            SERVE THE PUBLIC INTEREST ........................................... 41

      D.    SNAPPOWER IS LIKELY TO PREVAIL ON THE MERITS OF ITS
            CLAIMS ............................................................................. 42

            1.    Lanham Act – Section 43(a)(1)(A)-(B) ........................... 43

            2.    Utah Unfair Practices Act ............................................ 47

            3.    Utah Unfair Competition Act ........................................ 48

            4.    Patent Infringement ..................................................... 50

CONCLUSION ............................................................................... 51

## TABLE OF AUTHORITIES

Page

**Cases**

*Bauchman by and through Bauchman v. West High Sch.*, 900 F. Supp. 248
(D. Utah 1995).................................................................................................. 35

*City of Chanute v. Kansas Gas & Elec. Co.*, 754 F.2d 310 (10th Cir. 1985)................. 41

*Community Television of Utah, LLC v. Aereo, Inc.*, 997 F. Supp. 2d 1191
(D. Utah 2014).......................................................................................... 36, 37

*Cotrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248 (10th Cir. 1999)....................................... 44

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002)..................................................... 40, 43

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256
(10th Cir. 2004) .............................................................................................. 36, 37

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975)............................................................. 37

*Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 2003) .......... 43

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003)………………43

*Icon Health & Fitness, Inc. v. Johnson Health Tech N. Am., Inc.*, No. 1:10-CV-00209
DN-DBP, 2015 WL 164607, (D. Utah Jan. 13, 2015) .............................................. 48, 49

*Intermountain Stroke Center, Inc. v. Intermountain Health Care, Inc.*, 638 Fed. Appx.
778 (10th Cir. 2016) ...................................................................................... 43

*Klein-Becker USA, LLC v. Collagen Corp.*, No. 2:07-CV-873 TS, 2008 WL 4681781
(D. Utah Oct. 22, 2008) ...................................................................................... 35

*MonaVie, LLC v. Wha Lit Loh*, Case No. 2:11-cv-265 TS, 2011 WL 1233274
(D. Utah March 31, 2011)...................................................................................... 40

*Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13-CV-01598 (VLB), 2013
WL5962103 (D. Conn. Nov. 6, 2013) ............................................................... 41

*Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016)............ 42

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ........................................ 36

*Southwest Stainless, LP v. Sappington*, 582 F.3d 1176 (10th Cir. 2009) ..................... 36

*Tootsie Roll Indus., Inc. v. Sathers*, Inc., 666 F. Supp. 655 (D. Del. 1987) ................... 41

*TY, Inc. v. Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001) .......................................... 37

*Whitaker v. W. Essentials, LLC,* No. 1:15-CV-00048-TC, 2016 WL 3435185
(D. Utah June 17, 2016) ...................................................................................... 48

*Zoller Labs., LLC v. NBTY, Inc.*, 111 F. Appx. 978 (10th Cir. 2004)................................ 43

**Statutes**

15 U.S.C. § 1116(a) ................................................................................. 47

15 U.S.C. § 1125(a) ................................................................................. 47

15 U.S.C. § 1125(a)(1)(A)-(B) ................................................................. 43

Utah Code Ann. § 13-5-1 ........................................................................ 47

Utah Code Ann. § 13-5-17 ...................................................................... 48

Utah Code Ann. § 13-5-8 ........................................................................ 47

Utah Code Ann. § 13-5a-102(4)(a) .......................................................... 48

**Rules**

Fed. R. Civ. P. 65(b)(1) ........................................................................... 34

**INTRODUCTION**

As detailed in the Complaint filed contemporaneously herewith, SnapPower is the most recent victim of two giants in the "direct response" industry, which often market gimmicky, low priced consumer products like Miracle Copper Socks and AmberVision sunglasses through television commercial advertising.  Defendants Ontel Products Corporation ("Ontel") and TeleBrands Corporations ("Telebrands") (collectively, "Defendants") are affiliated with the "As Seen On TV" brand and are among the largest of companies in the business.  Ontel's founder and CEO is Defendant Ashok "Chuck" Khubani ("Chuck Khubani").  The founder and CEO of TeleBrands is Chuck Khubani's brother, Ajit "AJ" Khubani ("AJ Khubani").

SnapPower, on the other hand, is a reputable Utah company with approximately twenty employees.  With the assistance of a successful Kickstarter campaign, SnapPower over the past several years has diligently designed and brought to market three original products – the Guidelight, an outlet cover with built-in LED lighting that turns on and off automatically, the SnapPower USB Charger, an outlet cover with a built-in USB charger port, and the Switchlight, which is similar to the Guidelight but in the form of a light switch cover.  All three of SnapPower's products incorporate patented technology, including patented prongs that allow the products to draw power from an outlet or light switch without the use of any wires or batteries and, in the case of the outlet cover, without occupying either of the standard outlet receptacles.

SnapPower's products are well designed, convenient, easy to install, and have been favorably reviewed by numerous customers and publications, received several

awards, and been featured on television programs, including The Today Show. SnapPower has carefully and patiently built a loyal and growing customer base almost entirely through earned media, word-of-mouth, and online sales direct to customers through SnapPower's website and on Amazon.com ("Amazon").  In an effort to maintain a good margin and to protect its reputation for quality and world class customer service, both of which are extremely critical to an online-focused sales model, SnapPower has, to date, forgone many opportunities and chosen not to sell its product (i) in retail stores, including discount and "big box" stores; (ii) via television commercials and late night infomercials; or (iii) through any third-party websites.

Both Ontel and Telebrands have a very different business model, promoting low-end, often knock-off products via "corny" television infomercials for as long as those ads generate a given return over the amount spent on advertising, and then moving the best performing products into discount and "big box" retailers before they start the process over again.  This "churn-and-burn" model requires Defendants to constantly peruse specialty stores, mall kiosks, state fairs, consumer-goods trade shows, and sales platforms like Amazon to find the large number of products they need to knock off in order to keep their infomercial engines running.

Because engineering a product (even when Defendants are simply copying or reverse engineering the product), spooling up tooling and manufacturing, and building up actual inventory is expensive and risky for a churn-and-burn business that does not know how a given product will perform in an infomercial.  *Defendants have admitted to journalists that they often skip these steps.*  Instead, they simply create a fake

6

infomercial for a targeted product, run the infomercial on television for a test period (that consumers believe are real), and only then – armed with the test market data on how many of those consumers purchased what they believed was an existing product – do they decide whether to take the risk of manufacturing the product and taking orders they actually intend to fulfill.  In other words, by deceiving consumers, Defendants are able to quickly test legitimate companies' products for the infomercial market without spending any money actually developing, manufacturing, or having a product inventory.

Following this business plan, both Ontel and Telebrands have recently come out with commercials falsely advertising knock-off products that are *actually* SnapPower's Guidelight, using photos and video footage of actual Guidelights they purchased from SnapPower and incorporating photos lifted directly from the SnapPower website.  As is often the case, Defendants do not have their own comparable products, and in fact they have no products to sell at all.  Rather, they are again unlawfully "testing the market" to see if their infomercials generate sufficient "fake" sales to justify making a knock-off product, in the meantime drawing sales from SnapPower, generating significant customer confusion, and tarnishing SnapPower's valuable goodwill and reputation. Unless this Court grants injunctive relief, Defendants will likely add insult to irreparable injury by taking the information gained through their illegal and deceptive test advertising to knock-off and unfairly compete with SnapPower.

Preliminary injunctive relief is well warranted and necessary in this case. SnapPower is already suffering and will continue to suffer irreparable harm from Defendants' conduct.  SnapPower's customers have already become confused by the

competing advertising, and it has received numerous complaints from confused consumers about the poor customer service provided by Ontel and/or Telebrands. In fact, many consumers have already been defrauded into spending their money and wasting their time ordering products that don't even exist. Defendants' conduct is harming SnapPower's goodwill and reputation by confusing SnapPower's customers and giving the materially false impression that SnapPower is offering "As Seen On TV" products, rather than the carefully designed, engineered, and patented products it has worked so hard to develop. Defendants' conduct is also drawing sales from SnapPower and, if allowed to proceed unchecked, threatens to drive SnapPower from the market altogether.

In addition, the balance of harms weighs heavily in favor of SnapPower, and the public interest favors the issuance of a temporary restraining order. Ontel and Telebrands will suffer no harm if they are forced to cease falsely marketing products they are unprepared to sell and if they are otherwise compelled to cease engaging in unfair business practices that harm competition. By contrast, and as stated, SnapPower will suffer and is already suffering irreparable harm, including to its goodwill and reputation, because consumers are associating SnapPower with the direct response, infomercial industry and the poor products and services that often accompany it.

The public interest will also benefit from an injunction in this case. Ontel and Telebrands are both known for their deceptive and misleading business practices, having been the subject of numerous lawsuits and regulatory actions based on those

practices.  Enjoining these companies from falsely advertising and otherwise improperly and unfairly competing will benefit consumers and the marketplace, including by enforcing the laws enacted to promote fair competition and protect consumers.

Finally, SnapPower is highly likely to prevail on the merits of its claims.  In violation of the Lanham Act and Utah law, Ontel and Telebrands are engaging in literally false advertising and/or materially misleading advertising, both by offering SnapPower's own products in Defendants' commercials and websites and by offering to sell products it literally does not have.  Defendants are doing so in an unfair and deceptive manner, including by stealing images directly from SnapPower's website, depicting SnapPower's actual Guidelight on their websites and commercials, copying substantial elements of SnapPower's marketing materials and portions of SnapPower's video advertising, and by infringing SnapPower's patents.  Defendants are engaging in this conduct to illegally obtain valuable test marketing information and gain an unfair advantage, if and when they choose to introduce and actual knock-off product.  Defendants are piggybacking on the time, effort and money invested by SnapPower in developing its products, and stealing SnapPower's goodwill by market testing products they simply do not have.

Accordingly, SnapPower is entitled to a temporary restraining order requiring Defendants to (i) cease marketing the Night Angel and Luma Light products; (ii) take down the websites offering these products; (iii) enjoin Defendants from deceptively selling products they do not have; (iv) destroy and not use any of the market and customer information they gained through their illegal test infomercials; and (v) stop

them from knocking off products and stealing intellectual property created by innocent, unsuspecting third parties.

**STATEMENT OF FACTS**

**SnapPower and Its Products**

1.      SnapPower is a Utah company formed in 2012 with approximately twenty employees.  *See* Declaration of Jesse Leishman in Support of Motion for Temporary Restraining order ("Leishman Decl."), ¶¶ 2-3, attached hereto as Exhibit 1.

2.      SnapPower is the designer, manufacturer, marketer, and seller of the Guidelight, an electric outlet cover with built-in LED lighting and a light sensor; and the SnapPower USB Charger, an electric outlet cover with a built-in USB charger.  These products transform electrical outlets into night lights or chargers in a safe, sleek, easy-to-install manner, which leaves the electrical outlets free for use with other devices. *See id.* ¶¶ 4, 15, 17.

3.      The Guidelight provides LED lighting by three individual LED bulbs located on the bottom of the outlet cover.  *See id.* ¶ 9.



4.      The LED lights are automatically turned on and off by a light sensor

located in the lower left quadrant of the Guidelight, as depicted in the preceding image.

*See id.* ¶ 10.

5.      The Guidelight is easy to install and requires no wiring or batteries.  *See*

*id.* ¶ 11.

6.      SnapPower offers two versions of the Guidelight, the "Duplex" and the

"Decor," each of which comes in white, light almond, ivory, and black.  *See id.* ¶¶ 12-13.



7.      The SnapPower USB Charger is an outlet cover with a USB port that can be used to charge phones, tablets, and similar devices.  The USB Charger comes in both Duplex and Decor styles, each of which can be ordered in white, light almond, and ivory.  *See id.* ¶ 15.



8.      SnapPower also has designed and developed a product known as the SwitchLight, which is a light switch cover with LED lighting similar to the Guidelight. Although SnapPower has not yet offered the SwitchLight product for sale on its website, it has shown the product at trade shows, has patent applications pending as to certain aspects of the product, and has sold a large number of units to a hospitality customer. *See id.* ¶ 17.

9.      SnapPower is the current assignee, and the sole and exclusive owner of all right, title and interest in United States Patent No. 8,912,442 ("the '442 patent"), entitled "Active Cover Plate."  The '442 patent was duly and legally issued by the United

States Patent and Trademark Office ("USPTO") on December 16, 2014.  The named inventor of the '442 patent is Jeremy Smith.  A copy of the '442 patent is attached hereto as Exhibit 2.

10.     SnapPower is the current assignee, and the sole and exclusive owner of all right, title and interest in United States Patent No. 9,035,180 ("the '180 patent") (collectively, with the '442 patent, the "patents-in-suit"), entitled "Active Cover Plates." The '180 patent was duly and legally issued by the USPTO on May 19, 2015.  The named inventors of the '180 patent are Jeremy Smith, Phil Dietz, Sean Watkins, Jan Finlinson, Martin Johnson, and Jeremy Willden.  A copy of the '180 patent is attached hereto as Exhibit 3.

11.     The claimed inventions of the patents-in-suit are directed at active electrical outlet covers with loads that perform functions, such as LED lighting, light sensor, USB charger, speakers, and thermostats.  The patented inventions accomplish all of these functions while not impeding access to the electric outlets themselves.

12.     SnapPower's Guidelight practices certain aspects of the claimed technology of the '442 patent and the '180 patent.  *See* Leishman Decl. ¶ 14.

13.     SnapPower's USB Charger practices certain aspects of the claimed technology of the '442 patent and the '180 patent, as well as U.S. Patent No. 9,362,728, entitled "Active Cover Plates."  *See id.* ¶ 16.  SnapPower is also the current assigned, and the sole an exclusive owner of all right, title, and interest in the '728 patent.

**SnapPower's Website and Marketing**

14.     SnapPower's website is www.snappower.com (the "SnapPower website").
*See* Leishman Decl. ¶ 18; *see also* capture of SnapPower website attached as Exhibit
4.

15.     The website has copyright notices displayed on the bottom of each page.
The website went live in early 2014, and SnapPower began shipping product in May
2014.  SnapPower created and/or had created on its behalf all of the original content on
the website, including the design, text, images, and video footage that appear on the
site.  SnapPower is the owner of all original content and intellectual property included on
or related in any way to the website.  *See* Leishman Decl. ¶ 18.

16.     Among the videos on the SnapPower website is an original, roughly two-
minute, marketing video demonstrating the Guidelight.  *See* SnapPower website,
portions of which are attached as Exhibit 4.

17.     SnapPower has spent substantial time, effort, and resources to develop its
brand, products, website, and other marketing materials.  Leishman Decl. ¶ 7.

18.     SnapPower has taken steps to ensure that it offers excellent customer
service.  *See id.*

19.     SnapPower has developed strong goodwill and a positive reputation due
to these efforts, having received hundreds of positive reviews on both its website and
Amazon.  *See id.*

20.     The Guidelight has been featured on television programs such as the
Today Show, and it has received awards and favorable reviews from various

organizations, tradeshows, and publications, including the NAHB International Builders

Show, The Family Handyman, This Old House, and Handy Magazine.  *See id.* ¶ 8; *see*

*also* SnapPower website, Ex. 4.

### Ontel, Telebrands, and Knock-Off Product Business Model

21.     Ontel and Telebrands are big players in what is known as the "direct-

response" or "infomercial" industry and affiliated with and/or the originators of the "As

Seen On TV" brand.  *See, e.g.,* "As Seen On TV Company CEO Talks Bankruptcy, Epic

Comeback," http://www.bizjournals.com/philadelphia/news/2014/07/07/as-seen-on-tv-

company-ceo-talks-bankruptcy.html, July 9, 2014, attached as Exhibit 5.

22.     Because of their superior size, market penetration, and retail connections,

Defendants are able to quickly launch commercials and related advertising for knock-off

products, aggressively market the knock-offs, and if justified through "test marketing,"

they are able to quickly manufacture knock-off products and get them into "big box"

stores.

23.     In a similar article from 2007, AJ Khubani described walking around

shopping malls looking at the products offered by kiosks to get ideas for his company.

During the interview, he bought a product from a kiosk – a waterproof keyboard cover –

to look into for his own company, saying to the interviewer, "See?  We just found a

product.  It's not that hard."  *See* "Your Name in Stickup Light Bulbs!", New York

Magazine, Oct. 24, 2007, attached as Exhibit 6.

24.     According to AJ Khubani, Telebrands will launch a large number of

commercials for different products at a time to determine if the products will sell.

Telebrands will not manufacture the products if the test marketing does not indicate a

sufficiently large sales opportunity.  As described in the article,

> To roll out five new items, as Khubani will do this year, he'll
> film infomercials for at least twenty and try each one for a
> week.  Each trial needs to generate double its advertising
> costs to make it to a full launch, which involves buying millions
> of dollars in national advertising time and ordering between a
> half-million and a million pieces.

*Id.*

25.     In a more recent article, the process was similarly described:

> [T]he best [products] are chosen and given test marketing; the
> company will film 20 infomercials and try them out for at least
> a week.  If the product generates double the advertising cost,
> it moves to a wider release.  A month or two later, [the
> products] will end up on the "As Seen On TV" section of many
> chain stores.

"The History of Telebrands," http://www.brightreviews.com/article/the-history-of-

Telebrands, Apr. 6, 2015, attached as Exhibit 7.

26.     In a 2009 article, AJ Khubani explained that, "If something is in the

marketplace already and I can do a better job, I will."  *See* "Inventors Seek Pot of Gold

Through Telebrands, June 30, 2009, USA Today, attached as Exhibit 8.

### Litigation and Regulatory Action Against Defendants

27.     Ontel and Telebrands are no strangers to litigation and regulatory action

based on their improper business practices, including the knock-off business model,

with multiple lawsuits having been filed against them around the country, starting as far

back as the 1990s and continuing through the present.

28.     For example, the State of New Jersey recently sued Telebrands for violations of the New Jersey Consumer Fraud Act and Advertising Regulations, including aggressively upselling its products, subjecting consumers to lengthy ordering processes, failing to provide a means for consumers to decline offers for additional products, shipping and billing for products not ordered by consumers, and failing to provide customers the opportunity to speak with live customer service agents.  *See* Office of the New Jersey Attorney General Press Release, July 13, 2015, attached as Exhibit 9.

29.     Telebrands agreed to pay $550,000 and cease its improper sales practices to settle the matter.  *See id.*

30.     Telebrands and its owner, AJ Khubani, have also been the subjects of action by the Federal Trade Commission ("FTC"), including an action related to a product known as the Ab Force.  That matter was settled when Telebrands agreed to pay $7 million as part of settlement and customer restitution agreement.  *See* Stipulation of Settlement and Final Order, attached as Exhibit 10.

31.     Ontel and Telebrands have been subject to numerous lawsuits involving the knock-off strategy, with fact patterns similar to those presented here, involving the poaching of products and other intellectual property from their original creators without authority or compensation.  *See, e.g., GlowBowl, LLC v. Ontel Products Corp.*, Amended Complaint for Unfair Competition and Injunctive Relief Demanded, attached as Exhibit 11.

32.     Defendants appear to view litigation as a routine cost of doing business, particularly because they are likely able to capitalize on the associated delays by aggressively marketing and selling knock-off products until they are forced to stop.

**Ontel's Night Angel Knock-Off Products and Advertising**

33.     Ontel is a marketer and distributor of numerous consumer products, including Miracle Copper Socks, Slushy Magic, the Foot Angel, and the Slap Chop. Ontel markets its products through television commercials and a multitude of separate websites named after the individual products.  Ontel sells its products via telephone, online orders, and at various retail stores.  *See* www.ontelproducts.com, a capture of which is attached as Exhibit 12.

34.     Ontel recently created and broadcast nationwide a one minute, thirty-second-plus television commercial that unabashedly features and offers for sale the *original* SnapPower Guidelight, which it has re-named the "Night Angel."  The commercials are also featured on the website it launched to advertise the Night Angel, www.buynightangel.com (the "Night Angel website").  A partial capture of the Night Angel website is attached as Exhibit 13.

35.     Although in some instances the images of the Guidelight appear to have been doctored, for example by covering the light sensor or moving it from the left to the right side, the Night Angel appears to be identical to the Guidelight, i.e., *the same actual product*.

18

36.     Despite its minimal efforts to mask the SnapPower Guidelight as its own product, many of the images that appear in the Night Angel commercial are clearly identifiable as the actual Guidelight, including but not limited to the following:







37.    Like the Guidelight, the Night Angel is offered in Duplex and Decor:



38.    The Night Angel website also includes at least two photographs lifted directly from the SnapPower website.

39.    The first is a photograph taken at the SnapPower CEO's home, which depicts a Guidelight at the bottom of a flight of stairs  *See* Leishman Decl. ¶ 20.  This photograph appears on the SnapPower home page of its website.  *See* Leishman Decl. ¶ 20.  Ontel's version of the photograph as it appears on the Night Angel website is shown here next to SnapPower's photograph:

| Night Angel Website | SnapPower Website |
|---|---|
|  | |

*See* Night Angel website page attached as Exhibit 14.  (This page of the Night Angel website is separately attached because it is not accessible from the main website unless credit card information is entered for a purchase).

40.    The Night Angel website also incorporates another image from the SnapPower website, *with the exact same text* surrounding it:

| Night Angel Website | SnapPower Website |
|---|---|


41.     Another portion of the Night Angel website likewise incorporates text and layout features nearly identical to a portion of the SnapPower website, including the exact same text and numbers in grey circles.  The SnapPower website image is as follows:



42.    The similar portion of the Night Angel website is as follows:



43.    Through the same website, Ontel is also offering for sale a product similar to the SnapPower USB Charger, which is depicted as if it has three USB ports for charging electric devices such as cell phones and tablets:

24



*See* Night Angel website page attached as Exhibit 15.  (This page of the Night Angel website is separately attached because it is not accessible from the main website unless credit card information is entered for a purchase).

44.      In addition to offering the Night Angel and the Night Angel with USB ports, the Night Angel purports to offer a Night Angel "Switch Light" like the SnapPower SwitchLight.  SnapPower has displayed its SwitchLight product at trade shows and has begun selling it.  The Night Angel Switch Light is depicted as follows:



*See* Night Angel website page attached as Exhibit 16 (This page of the Night Angel website is separately attached because it is not accessible from the main website unless credit card information is entered for a purchase).

### Telebrands' Luma Plate Knock-Off Product and Advertising

45.     Like Ontel, Telebrands is a marketer and distributor of numerous consumer products, including AmberVision sunglasses, Pocket Hose, Couch Coat, and the Ped Egg foot file.  Telebrands markets its products through television commercials and a multitude of separate websites named after the individual products.  Telebrands sells its products via telephone, online, and at various retail stores.  *See* www.telebrands.com, a partial capture of which is attached as Exhibit 17.

46.     Also like Ontel, Telebrands recently began aggressively marketing a product identical to the Guidelight – the Luma Plate – through a one minute, thirty-second-plus television commercial on national television and through a newly-launched

26

website, www.lumaplate.com (the "Luma Plate website"), where the commercial is also

displayed.  *See* Luma Plate website, a partial capture of which is attached as Exhibit 18.

47.     The purported Luma Plate is identical to the Guidelight.  Like the

Guidelight, it has a light sensor in the lower left corner with three LED bulbs emitting

light from the bottom of the coverplate:



48.     Also like the Guidelight, the Luma Plate comes in both standard and

"decor" options:



49.    The Luma Plate Website also incorporates many of the same design features and text as are displayed on SnapPower's website.

50.    Parts of the Luma Plate commercial are very similar to parts of the SnapPower video of the Guidelight, and the Luma Plate commercial depicts the actual Guidelight product throughout, with only minimal "photo shopping" or modification to a

small number of the images of the Guidelight in the commercial and on the website.  For

example:







51.     Prior to creating their own alleged products and websites, Defendants and/or persons affiliated with them purchased numerous Guidelights and SnapPower USB Chargers from SnapPower, starting in approximately September 2016, presumably for purposes of examining and copying the product, as well as using it in their internet and commercial advertising.

52.     For example, on August 29, September 2, 8 and 20, October 2, October 11, 12, October 24, October 28, and November 4, 2016, Ontel's CEO, Chuck Khubani, placed various orders for SnapPower products, including Guidelights and SnapPower USB Chargers.  These orders were all shipped to an Ontel employee, Lisa Siervo, at Ontel's business address.  Copies of the orders are attached as Exhibit 19.

53.     On September 6, 2016, an individual named Daniel Bora ordered a Guidelight, which was also shipped to Ms. Siervo at Ontel's business address.  A copy of the order is attached as Exhibit 20.

54.     On October 2, 2016, an individual named Neil Khubani purchased five Guidelights.  Upon information and belief, Neil Khubani is related to Ontel, Telebrands, and/or its principals, Chuck and AJ Khubani.  A copy of the order is attached as Exhibit 21.

### Discovery of Defendants' Commercials & Websites
### Resulting Customer Confusion

55.     In early November 2016, SnapPower discovered that Ontel was running the Night Angel commercial, when an acquaintance and SnapPower customer alerted one of SnapPower's founders that he had seen a commercial for an "Angel light" on ESPN.  At the same time or shortly thereafter, SnapPower discovered the Night Angel website.  *See* Leishman Decl. ¶ 21; *see also* Declaration of Sean Daniel Watkins ("Watkins Decl.") ¶ 3, attached as Exhibit 22.

56.     On the same day, a relative of another SnapPower employee saw the Night Angel commercial on television twice.  He was confused as to whether the Night Angel was the SnapPower Guidelight or whether SnapPower had partnered with someone else to sell the Guidelight.

57.     On November 8, 2016, another SnapPower customer contacted SnapPower regarding the Luma Plate, stating that he had seen a television commercial for the Luma Plate and inquiring if the www.lumaplate.com website belonged to SnapPower.  *See* Leishman Decl. ¶ 24; *see also* Watkins Decl. ¶ 4.

58.     SnapPower then discovered that Telebrands was running the Luma Plate website and selling the Luma Plate.  *See* Leishman Decl. ¶ 25.

59.     One consumer recently expressed confusion as to the source of SnapPower's products inquiring if SnapPower's were on back order.  The customer attempted to purchase an outlet cover with LED lighting from one of the Defendants. After he discovered the purchase was unsuccessful, he mistakenly complained on SnapPower's Facebook page that the product he tried to purchase was unavailable. When SnapPower responded that its products were available, the customer reported that he was confused and asked whether there was someone else selling the same product.  *See id.* ¶ 29.

60.     Another customer recently posted a snapshot from the Night Angel website on SnapPower's Facebook page, asking if the Night Angel was SnapPower's product.  *See id.* ¶ 30.

61.     On November 23, 2016, another individual sent an email to the SnapPower customer service department, asking why her order had not yet arrived. She attached a copy of the order to her email.  The order clearly indicates that what she purchased was a Night Angel and a Night Angel USB charger.  *See id.* ¶ 31; *see also* SnapPower Support Case Form and attached Night Angel Order Form, attached as Exhibit 23.

62.     SnapPower was recently approached by Walmart regarding carrying SnapPower's products in Walmart's stores.  Walmart's request was unsolicited.  At this time, SnapPower has declined to place its products in such "big box" stores for business

33

reasons, including being able to control customer experience and price.   *See* Leishman

Decl. ¶ 30.

## ARGUMENT

**I.      SNAPPOWER IS ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS**

Federal Rule of Civil Procedure 65 authorizes a federal court to issue injunctive

relief, including a temporary restraining order and preliminary injunction.  A temporary

restraining order on an *ex parte* basis is appropriate if:  "(A) specific facts in an affidavit

or verified complaint clearly show that immediate and irreparable injury, loss, or damage

will result to the movant before the adverse party can be heard in opposition; and (B)

the movant's attorney certifies in writing any efforts made to give notice and the reasons

why it should not be required."  Fed. R. Civ. P. 65(b)(1).  SnapPower satisfies both

prongs.

First, as discussed more extensively *infra* section II.A, and as set forth in the

Declarations of Jesse Leishman and Sean Daniel Watkins, SnapPower is suffering

immediate and irreparable harm from Defendants' conduct.  Despite SnapPower's

expenditure of considerable time and resources to develop and bring to market its

Guidelight and USB Charger, Defendants' false advertising, patent infringement, and

copying of SnapPower's products are already confusing SnapPower's customers,

diluting its brand, and harming its reputation and goodwill.  Defendants' products are

threatening to hit the shelves during the busy holiday season, which has the potential to

drive SnapPower completely out of business.

Defendants are not concerned with delivering quality, patented products that satisfy customers.  Rather, Defendants hope to make significant profits by capitalizing on SnapPower's goodwill and reputation and flooding the market with knock-off "As Seen On TV" products that fail to meet consumer standards.  Unless enjoined, SnapPower's goodwill and reputation will be damaged and could forever be tarnished by this conduct.  *Ex parte* relief is therefore warranted.

Second, upon filing this motion, SnapPower's attorneys will immediately deliver the Complaint and this motion to professional process servers who will attempt to serve Defendants, and copies of the documents will be sent to Defendants by U.S. and certified mail.  SnapPower will continue its attempts to notify Defendants of these proceedings.  If SnapPower is granted a TRO hearing, which it should be, SnapPower will also endeavor to provide Defendants with notice thereof, and by the time of the hearing will provide a declaration to the Court regarding its efforts to notify Defendants.

One of the busiest shopping seasons of the year is upon us, including Cyber Monday, and the threat of irreparable harm promises only to increase over the coming days and weeks.  As such, an *ex parte* temporary restraining order should immediately issue.

## II.   SNAPPOWER IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS' CONDUCT

The standard for a temporary restraining order is the same as for a preliminary injunction.  *See Klein-Becker USA, LLC v. Collagen Corp.*, No. 2:07-CV-873 TS, 2008 WL 4681781, *1-*2 (D. Utah Oct. 22, 2008) (citing *Bauchman by and through Bauchman v. West High Sch.*, 900 F. Supp. 248, 250 (D. Utah 1995)).  A federal court

may issue preliminary injunctive relief when movant establishes the following four elements:  (1) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (2) that the balance of equities tips in movant's favor; (3) that the injunction is in the public interest; and (4) a likelihood of success on the merits.  *See Community Television of Utah, LLC v. Aereo, Inc.*, 997 F. Supp. 2d 1191, 1197 (D. Utah 2014) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009)). Here, each prong is met, and SnapPower is entitled to a temporary restraining order.

### A. SNAPPOWER IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT THE REQUESTED INJUNCTIVE RELIEF

"[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks and citations omitted).  Irreparable harm is present where the injury at issue "is incapable of being fully compensated for in damages or where the measure of damages is so speculative that it would be difficult if not impossible to correctly arrive at the amount of the damages."  *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009).

The United States Supreme Court has declared that "a substantial loss of business . . . sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."  *Doran v. Salem Inn, Inc.*, 422 U.S. 922,

932 (1975). Indeed, courts have recognized that a preliminary injunction is particularly appropriate in cases involving the loss of goodwill or damage to a business reputation because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill." *TY, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902 (7th Cir. 2001). Similarly, this district has stated that "irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as *loss of goodwill* or *competitive market position*." *Community Television of Utah, LLC v. Aereo, Inc.*, 997 F. Supp. 2d 1191, 1203 (D. Utah 2014) (emphasis added) (quoting *Dominion Video Satellite*, 356 F.3d at 1260).

In this case, SnapPower is suffering and will continue to suffer harm if an order is not granted to enjoin Defendants from continuing their suspicious business practices of falsely advertising products that are not their own and do not yet exist, and then using the information gained through that false advertising to then manufacture their infringing, knock-off "As Seen On TV" products. This harm cannot be quantified or fully compensated by monetary damages. SnapPower is a relatively young company that is in the process of establishing its products and the customer market for its products. To be successful in this process, SnapPower has expended significant resources and time, which Defendants are now trading on and harming. The Guidelight and SnapPower USB Charger are high-quality, innovative, patented products that have been well received by the consumer market. Indeed, the Guidelight practices technology claimed in SnapPower's '442 patent and '180 patent. And the SnapPower USB Charger

practices technology claimed in SnapPower's '442 patent, '180 patent, and '728 patent. These products have also received hundreds of favorable customer reviews, and SnapPower has received multiple industry awards for its innovative products, such as the NAHB International Builders' Show "Overall Best in Show" and "Best of Indoor Living Product" awards.  Now they are being presented as "As Seen On TV" knockoffs.

SnapPower, however, has not rested on the laurels of its Guidelight and SnapPower USB Charger.  Rather, SnapPower has continued to invest significant resources in the development of new innovative products and continued customer satisfaction.  SnapPower is thus positioned to offer its next high-quality product, the SnapPower Switchlight, which already has patent applications pending on certain aspects of its technology.  The Switchlight is likely to be similarly well received by consumers:  a hospitality customer has already placed a large order.  In short, as a result of SnapPower's significant efforts, SnapPower has developed a reputation for producing high-quality innovative products that have earned it significant goodwill and a positive reputation among consumers.

Defendants' conduct of falsely advertising and manufacturing infringing knock-off "As Seen On TV" products directly threatens SnapPower's substantial investments and efforts.  Defendants have a long-history of doing exactly what they are attempting to do to SnapPower:  profiting off a small company's investments, reputation, and goodwill by falsely advertising those products as their own and then flooding the market with inferior knock-off products.  Defendants accomplish this by first obtaining a sample of the product they want to knock-off.  Defendants then create and run false and misleading

infomercials (or over-length "commercials," as in this case) to test the market, inevitably leading to customer confusion.  Assuming the market testing shows sufficiently positive results, Defendants proceed to manufacture the inferior knock-off products and distribute them through their extensive network of retail outlets, such as Walmart. Defendants then flood the market with their inferior products, destroying the goodwill and reputation of the originator while profiting handsomely off the customer confusion. The result is that the original product's reputation and goodwill is tarnished, ultimately driving the originator out of business.

In this case, Defendants have already obtained and copied SnapPower's Guidelight and USB Charger products.  Defendants have also created and run false and misleading commercials for their knock-off "As Seen on TV" products, the Night Angel and the Luma Plate.  These commercials have already generated substantial consumer confusion, and Defendants may already be in the process of manufacturing the inferior knock-off Night Angel and Luma Plate products.  Just recently, SnapPower received an inquiry about placing its products on Walmart's shelves, which is likely the result of Defendants' attempt to place their products at Walmart stores.  Defendants' history thus informs us that the likely next step is for the inferior knock-off products to flood the market during this busy holiday season.

As such, without an order enjoining Defendants from the above conduct and next step, SnapPower stands to lose competitive position, its favorable reputation, and goodwill in the market.  This could ultimately lead to SnapPower being forced out of business.  These harms are unquantifiable and relate to SnapPower's unique market

position and investment in that market position.  *See, e.g., MonaVie, LLC v. Wha Lit Loh*, Case No. 2:11-cv-265 TS, 2011 WL 1233274, *3 (D. Utah March 31, 2011) (granting an *ex parte* temporary restraining order is justified because the threatened irreparable harm included "(1) diminished sales and diluted trademarks, trade names, and goodwill; (2) lost control and quality of its products and business . . .; or (3) exclusion from the market altogether."  ).  Consequently, Defendants' conduct has and is causing SnapPower irreparable harm and the Court should issue a temporary restraining order immediately, followed by a preliminary injunction.

**B.    THE HARM FACING SNAPPOWER FAR OUTWEIGHS ANY POTENTIAL HARM TO DEFENDANTS FROM THE REQUESTED INJUNCTIVE RELIEF**

In determining whether to grant an injunction, consideration must be given to whether the defendant would suffer greater harm than the plaintiff if the requested injunctive relief is granted.  *See Davis v. Minetta*, 302 F.3d 1104, 1116 (10th Cir. 2002). If a defendant's alleged harm from the injunction is of a "self-inflicted nature," this consideration will weigh in favor of granting injunctive relief.  *Id.*  There is little doubt that the equities weigh strongly in favor of granting SnapPower's requested injunctive relief. As described *supra* in section II.A, SnapPower has and will suffer significant harm to its reputation and goodwill, and it could be entirely excluded from the market.  By contrast, any harm or loss of "investment" that Defendants may purport to claim as a result of the injunction is harm that Defendants inflicted upon themselves.  Defendants knowingly misappropriated SnapPower's products and intellectual property, falsely advertised SnapPower's products as their own, and they are wrongfully attempting to profit off of

SnapPower's ingenuity, reputation, and goodwill.  Indeed, Defendants' entire business model is based on obtaining these ill-gotten gains and, as such, they view litigation simply as the cost of doing business.  Defendants are likely to suffer very little harm, if any, and any harm they may suffer is self-inflicted.  Moreover, given the circumstances, SnapPower should not be required to post a bond to cover any harm, if the temporary restraining order issues.

Accordingly, the balance of harm weighs significantly in favor of SnapPower and SnapPower's requested temporary restraining order should be entered.

### C.    ISSUANCE OF THE REQUESTED INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST

To prevail on this element, SnapPower need only establish that injunctive relief will not be adverse to the public interest.  *See City of Chanute v. Kansas Gas & Elec. Co.*, 754 F.2d 310, 312 (10th Cir. 1985).  Injunctive relief in this case is not adverse to the public interest because the public interest favors protection of the goodwill of businesses.  *See Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13-CV-01598 (VLB), 2013 WL 5962103, at*8 (D. Conn. Nov. 6, 2013) (explaining that "there is a public interest in the protection of the goodwill of businesses."); *Tootsie Roll Indus., Inc. v. Sathers*, Inc., 666 F. Supp. 655, 661 (D. Del. 1987) (recognizing that "the public has an interest in protecting business good will.").  As explained *supra* in section II.A, this injunctive relief will protect SnapPower's reputation and goodwill, just as it will deter unfair business practices and promote fair and ethical competition.  Moreover, the public will benefit from the issuance of an injunction because the public is being harmed by

Defendant's false advertising and being deceived into ordering products that do not exist.  Thus, this factor also weighs significantly favor of SnapPower.

### D.   SNAPPOWER IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS

SnapPower is also entitled to a temporary restraining order because it is highly likely to prevail on the merits of its claims, including for false advertising under the Lanham act and violations of the Utah Unfair Practices Act (the "UUPA") and the Utah Unfair Competition Act (the "UUCA").

With respect to this element of the standard for injunctive relief, the Tenth Circuit has explained that

> "[t]he very purpose of an injunction under Rule 65(a) is to give temporary relief based on a *preliminary estimate* of the strength of the plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case.'  Although "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success," "[a]ll courts agree that plaintiff must present a prima facie case but *need not show a certainty of winning*."

*Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1252 (10th Cir. 2016) (emphases added) (citations omitted).  Further, SnapPower need not establish a likelihood of success on all of its claims; instead, SnapPower is entitled to an injunction even if it meets the standard as to just one of its claims.  *See, e.g., id.* at 1252 (holding that plaintiff was entitled to a preliminary injunction where it established a likelihood of success on the merits on two of its three claims).

The Tenth Circuit has also held that, "[i]f the plaintiff can establish that the . . . three requirements [other than likelihood of success] tip strongly in his favor, the test is modified, and the plaintiff may meet the requirements for showing success on the merits

by showing that questions going to the merits are so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 2003) (quoting *Davis v. Mineta*, 302 F.3d 1104,1111 (10th Cir. 2002); *see alsoHeideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).

### 1.    Lanham Act – Section 43(a)(1)(A)-(B)

To prevail on a claim of false advertising under the Section 43(a) of the Lanham Act, a plaintiff must show by a preponderance of the evidence the defendant made a materially "false designation of origin, false or misleading description of fact, or false or misleading representation of fact" in commerce in connection with its advertising of a product which is either:

(A) likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person; or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1)(A)-(B).  A plaintiff must also show that it is "likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products."  *Zoller Labs., LLC v. NBTY, Inc.*, 111 F. Appx. 978, 982 (10th Cir. 2004).

With respect to the first element, a representation of fact can be either literally false or likely to mislead and confuse consumers.  *See Intermountain Stroke Center, Inc. v. Intermountain Health Care, Inc.*, 638 Fed. Appx. 778, 784-85 (10th Cir. 2016).

The standard is articulated in this manner because "'Section 43(a) . . . encompasses more than literal falsehoods,' because otherwise, 'clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed.'" *Cotrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999) (citations omitted). Defendants,' actions in this case are both false and have lead to consumer confusion.

First, the evidence unequivocally demonstrates that Defendants are falsely representing SnapPower's Guidelight product as their own, and falsely representing that they are offering the Guidelight for sale, and falsely representing that the Guidelight has been re-branded as the Night Angel or the Luma Plate. These representations are literally false. Defendants are not authorized to sell SnapPower's products, and yet they have incorporated into their advertising photos and videos of *SnapPower's* product – the Guidelight – and the only images that are even slightly different from the Guidelight appear to have been simply edited or "photo shopped." This literal falsehood is more than sufficient to establish that Defendants have made false representations regarding their alleged "products" in commerce.

Further, neither Ontel nor TeleBrands has manufactured any similar product to sell, such that they are also falsely representing that they have any product to sell. They do not. Indeed, although SnapPower has had a number of individuals attempt to purchase product off Defendants' websites, the purchases have not been successful and the would-be buyers' credit cards have not even been processed. Given that they have no product to sell, Ontel and Telebrands are falsely representing that they a have

product and that it will be as high-quality as the SnapPower product, when it is likely that any knock-off product Defendants throw together will be inferior.

Second, the evidence also establishes that Defendants' misrepresentations of fact are likely to cause confusion or mistake as to the affiliation of Defendants with SnapPower and as to the origin, sponsorship, or approval by SnapPower of the Night Angel and Luma Plate products and Defendants' commercial activities, satisfying section 43(a)(1)(A) of the Lanham Act.  SnapPower's customers and consumers in general have already experienced confusion and have reported as much to SnapPower. For example, at least two persons inquired of SnapPower after seeing Defendants' commercials on television whether the product being advertised was SnapPower's. One of those individuals also inquired whether SnapPower had entered into some sort of agreement allowing the Night Angel purveyors to sell the Guidelight.  Another consumer complained to SnapPower that he had unsuccessfully attempted to purchase an outlet cover with LED lighting, thinking that he had purchased the SnapPower product when in fact he had not.  Another customer inquired on SnapPower's Facebook page whether the Night Angel product was SnapPower's and, as recently as November 23, 2016, a customer sent in inquiry to SnapPower's customer service department asking why her order had not yet arrived.  The order receipt attached to her inquiry, however, revealed that she had purchased Night Angel products.  These incidents show that consumers are confused and likely will continue to be confused as to whether SnapPower is affiliated with Ontel and/or TeleBrands, whether the products being offered by Ontel and TeleBrands are SnapPower's products, and whether SnapPower

has somehow approved or sponsored the purported "products" being offered by Ontel and TeleBrands.  Unless enjoined, confusion will irreparably harm SnapPower's reputation, goodwill, and market position.

Likewise, under Section 43(a)(1)(B), Defendants' misrepresentations of fact are misrepresenting the nature of their own alleged products because they are presenting the Guidelight and associated products as their own products, even though the Guidelights clearly are not Defendants' products and Defendants have no products to sell.  Even if Ontel and Telebrands are making or later determine to make knock-off products, their representations as to their own products are likely to be false, since the likelihood they will function  as represented, i.e., as well as *SnapPower's products*, is minimal.

Finally, there is no doubt that SnapPower has been harmed as a result of Defendants' conduct.  Customers who otherwise would have purchased from SnapPower have, due to Defendants' false advertising, sought to purchase product from Defendants, and additional sales are likely to be diverted..  In the absence of injunctive relief, Defendants – with their greater resources and access to retail stores – will flood the airwaves and the internet with advertising and the market with inferior product, drowning out SnapPower's marketing and forcing SnapPower out of business. To add insult to injury, due to Defendants' inferior customer service and the likely inferiority of any knock-off products they ultimately may produce, Defendants' false advertising has already caused and will continue to tarnish SnapPower's reputation and goodwill.  As noted, potential customers have accused SnapPower of providing inferior

service, believing they have purchased a SnapPower product from SnapPower, when in fact they have attempted to purchase product from Ontel and/or TeleBrands.

In addition to the other remedies offered under the Lanham Act, the statute specifically authorizes injunctive relief in these circumstances, stating that courts may grant injunction to prevent a violation under, among other provisions, 15 U.S.C. § 1125(a).  *See* 15 U.S.C. § 1116(a).

In short, because SnapPower is likely to prevail on its claim under Section 43(a)(1) of the Lanham Act, immediate injunctive relief is warranted.

2.    Utah Unfair Practices Act

The evidence demonstrates that SnapPower is likely to prevail on its claim against Defendants under the UUPA.  *See* Utah Code Ann. § 13-5-1 *et seq.*

Among other things, the UUPA prohibits "any person engaged in business within the state to advertise goods, wares, or merchandise that it is not prepared to supply." Utah Code Ann. § 13-5-8.  Defendants' violation of this provision of the statute is apparent.  Neither Ontel nor TeleBrands is authorized or able to sell the product they are actually advertising – the *SnapPower Guidelight*.  And, even if they were legitimately advertising their own, non-infringing versions of SnapPower's products, they are not prepared to supply the products because they have not manufactured the products.

Defendants' conduct in this case is exactly the type of conduct the UUPA is intended to prohibit:

> [T]he purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest

47

competition is destroyed or prevented.  This act shall be liberally construed that its beneficial purposes may be subserved.

Utah Code Ann. § 13-5-17.  Here, Defendants are clearly offering product before they even have it, in order to stifle competition during the prime-selling holiday season.

Defendants are highly likely to be found liable on the merits of SnapPower's UUPA claim.

### 3.   Utah Unfair Competition Act

SnapPower's claim against Defendants based on the UUCA is also meritorious and likely to prevail.  Under the UUCA, unfair competition is prohibited and occurs when a defendant engages in "an intentional business act or practice" that "is unlawful, unfair, or fraudulent;" "leads to a material diminution in value of intellectual property;" and "is ... infringement of a patent."  Utah Code Ann. § 13-5a-102(4)(a); *see also Whitaker v. W. Essentials, LLC,* No. 1:15-CV-00048-TC, 2016 WL 3435185, at *4 (D. Utah June 17, 2016); *Icon Health & Fitness, Inc. v. Johnson Health Tech N. Am., Inc.*, No. 1:10-CV-00209-DN-DBP, 2015 WL 164607, at *3 (D. Utah Jan. 13, 2015).  These elements are met here.

First, Defendants' conduct involves intentional business practices that are unlawful, unfair, and/or fraudulent.  Both Ontel and Telebrands have demonstrated a pattern of engaging in the type of improper and deceptive competitive conduct they are engaged in here; namely, falsely advertising a product designed and developed by another party, without having even begun to develop their own product, and without seeking the consent of or offering to compensate the actual developers of the original products.  Defendants have intentionally taken images and video footage of

48

SnapPower's products, including images lifted directly from the SnapPower website, and they have done so "without having to engage in any of the associated work or expenditures, in an effort to improperly increase [Defendants'] market reputation and competitive advantage." *Icon Health & Fitness,* 2015 WL 164607, at *3 (citing allegations found to be sufficient to state a claim under UUCA). Stated differently, Defendants' business practice in this case – which it has engaged in before and is now aimed at SnapPower – is unethical and seeks to capitalize on the efforts of SnapPower.

Second, Defendants' conduct is currently diminishing and threatens to further materially diminish the value of SnapPower's intellectual property rights. Not only are Defendants lowering the value of Snap Power's patent rights through infringement, but also Defendants are displaying SnapPower's products as their own without actually having any product to offer. Defendants' infringement of SnapPower's patents will also encourage others to infringe. Ontel has also literally stolen a number of SnapPower's images and published them in its Night Angel website, and it has incorporated certain aspects of the text, design, and layout of SnapPower's website into the Night Angel website. Both Defendants have replicated in their commercials certain significant features of SnapPower's video on the Guidelight. These actions are diminishing the value of SnapPower's intellectual property rights, including by diluting the SnapPower brand, confusing consumers and affiliating SnapPower and its products with an industry of which it is not a part, i.e., the direct response or infomercial industry and the "As Seen On TV" brand.

The last element of a claim under the UUCA is also satisfied because Defendants' Night Angel and Luma Plate products are infringing SnapPower's patents. As discussed more *infra* section II.D(4), the Night Angel and Luma Plate infringe SnapPower's patents on the Guidelight because, among other reasons, they are SnapPower's own products.

In short, the evidence establishes the elements of a claim on which SnapPower is likely to succeed under UUCA.

### 4.   Patent Infringement

SnapPower's claim against Defendants for infringement of the '442 patent and the '180 patent is also meritorious and likely to prevail.  SnapPower is the owner of both the '442 patent and the '180 patent.  Both the '442 patent and the '180 patent are also validly issued patents from the USPTO.  SnapPower's Guidelight practices claimed elements of both the '442 patent and the '180 patent.  Telebrands' Luma Plate and Ontel's Night Angel are direct copies of SnapPower's Guidelight.  Indeed, it appears that Defendants are essentially rebranding the Guidelight as the Luma Plate or Night Angel and then offering it for sale.  Defendants' conduct is not authorized nor are Defendants licensees of the '442 patent or '180 patent.  Consequently, Defendants' conduct is infringing both the '442 patent and the '180 patent, and SnapPower is likely to succeed on the merits of its infringement claims.

## CONCLUSION

For all of the foregoing reasons, SnapPower respectfully asks the Court to grant its motion for temporary restraining order, and to set a hearing for a preliminary injunction thereafter.

DATED this 28th day of November, 2016.

**MAGLEBY CATAXINOS & GREENWOOD**


/s/ Christine T. Greenwood
James E. Magleby
Christine T. Greenwood
*Attorneys for Plaintiff SnapPower*

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MAGLEBY CATAXINOS &

GREENWOOD, 170 South Main Street, Suite 1100, Salt Lake City, Utah 84101, and that

pursuant to Rule 5 of the Federal Rules of Civil Procedure, a true and correct copy of

the foregoing **MOTION FOR TEMPORARY RESTRAINING ORDER** was delivered this

28th day of November, 2016, via process server, U.S. mail, and certified U.S. Mail to the

following:

| | |
|---|---|
| ONTEL PRODUCTS CORPORATION<br>Ashok "Chuck" Khubani<br>21 Law Drive<br>Fairfield, New Jersey 07004 | Ashok "Chuck" Khubani<br>C/O ONTEL PRODUCTS CORPORATION<br>21 Law Drive<br>Fairfield, New Jersey 07004 |
| TELEBRANDS CORPORATION<br>81 Two Bridges Road<br>Fairfield, New Jersey 07004 | Ajit "AJ" Khubani<br>C/OTELEBRANDS CORPORATION<br>81 Two Bridges Road<br>Fairfield, New Jersey 07004 |

_/s/ Zoe Perry_____